# In the United States Court of Federal Claims

No. 15-1081T

(Filed: January 18, 2018)

```
*************************************
WALTER SHIELDS and MAUREEN          *
ALLENBACH,                          *
                                    *   Cross-Motions for Summary Judgment;
            Plaintiffs,             *   RCFC 56; Tax Refund; Capital Loss; Theft
                                    *   Loss; Substantial Variance; Informal
v.                                  *   Claim; Waiver; General Claim;
                                    *   Germaneness; Quasi-Estoppel; Duty of
THE UNITED STATES,                  *   Consistency
                                    *
            Defendant.              *
*************************************
```

Brian G. Isaacson, Seattle, WA, for plaintiffs.

Brian J. Sullivan, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

  Before the court is plaintiffs' motion for summary judgment or partial summary judgment and defendant's cross-motion for summary judgment. Both motions are made pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiffs claim that the Internal Revenue Service ("IRS") owes them a refund of their federal income taxes. For the reasons set forth below, plaintiffs' motion is denied and defendant's motion is granted.

### I. BACKGROUND

  Plaintiffs are Walter Shields and Maureen Allenbach, a married couple living in the state of Washington.[1] Am. Compl. ¶¶ 1-2. Mr. Shields is a life insurance broker with the firm of Kibble & Prentice. Id. ¶ 5. Mr. Shields also holds himself out as a certified financial planner. See id. Ex. A at 5. One of Mr. Shields's former clients is Michael Mastro, a real estate developer

---

[1] The facts in this section are derived from both parties' submissions, including the attached appendices and exhibits, and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence. Only one citation is provided for each duplicative submission.

in Seattle, Washington. Id. ¶ 5. As a result of his business relationship with Mr. Mastro,[2] Mr. Shields personally loaned him $511,731: $46,731 in 2004; $60,000 in 2005; $100,000 in 2006; $105,000 in 2007; and $200,000 in 2008. Id. In exchange for these so-called "Friends & Family" ("F&F") loans, Mr. Mastro provided Mr. Shields with an unsecured promissory note that earned 9% annual interest, which accrued and was compounded monthly. See Def.'s Opp'n Ex. 18 (promissory note and schedule of disbursements and accrued interest). Mr. Shields's F&F loans accrued over $100,000 in unpaid interest, reaching a total balance of $613,890.42, through March 2009. Id. Plaintiffs' 2008 federal income tax return was due on April 15, 2009, and was timely filed. Def.'s Opp'n Ex. 31 at 2; see also I.R.C. § 6072(a) (2006).

On July 10, 2009, three banks that had lent money to Mr. Mastro—Columbia Bank, First Sound Bank, and Venture Bank—filed an involuntary Chapter 7 bankruptcy petition against him in the United States Bankruptcy Court for the Western District of Washington ("Bankruptcy Court"). Am. Compl. ¶¶ 7, 12. Later that day, Mr. Shields visited Mr. Mastro in his office, and Mr. Mastro told Mr. Shields about the bankruptcy petition that had been filed against him. Def.'s Opp'n Ex. 13 (Shields Dep. 69:5-70:22). At that point, Mr. Shields believed that the promissory notes Mr. Mastro had given him were "worthless." Id. (Shields Dep. 113:20-115:6).

On August 21, 2009, Mr. Mastro converted his bankruptcy case to a voluntary Chapter 7 liquidation. Am. Compl. ¶ 16. On September 16, 2009, Mr. Shields filed a proof of claim seeking to recover $613,890.42 in "money loaned" to Mr. Mastro, and attached (1) a copy of the promissory note and (2) a schedule of disbursements and accrued interest. See Pls.' Mot. Judicial Notice Ex. B. James Rigby, who was appointed Mr. Mastro's Chapter 7 bankruptcy trustee, hired Mordy Consulting, P.C. ("Mordy") to perform a solvency analysis of Mr. Mastro. Am. Compl. ¶ 9. Mordy concluded:

> Mastro's financial records were kept on a cash basis. The derivation of asset values shown in his statement of financial condition was not based on the cost of the properties acquired but was estimated from his own conclusions of value and from often outdated appraisals he obtained on many of the properties he owned. As such the net worth portrayed in Mastro's Statement of Financial Condition was, in my opinion, highly suspect, and given the nature of the assets could very likely never have been achieved should Mastro decide to exit the business. . . . Mastro represented his net worth at the end of 2008 as approximately $125.6 million[;]

---

[2] As a result of his facilitating Mr. Mastro's purchase of several life insurance policies through Kibble & Prentice, Mr. Shields had access to information regarding Mr. Mastro's finances. Def.'s Mem. Supp. Opp'n to Pls.' Mot. Summ. J. & Supp. Def.'s Cross-Mot. Summ. J. ("Def.'s Opp'n") Ex. 13 (Shields Dep. 47:8-25). The insurance company inspection teams who reviewed Mr. Mastro's applications and approved the policies also had access to this information. Id. (Shields Dep. 24:6-26:8).

> however, in his amended bankruptcy schedules, nine months later, Mastro's net worth was a negative $196.4 million, as he valued his assets at approximately $384.6 million and his liabilities at approximately $581 million.

Id. (internal quotation marks omitted).  Mordy further noted:

> Most F&F investors appear to have been unaware of Mastro's true financial status.  F&F investors were not provided with Mastro's financial reports he provided to his lenders and did not appear to have an understanding that Mastro's business operated at a negative cash flow, and that he needed to borrow money and/or sell his properties in order to cover this negative cash flow.  In my opinion, had Mastro shared his true financial picture in August 2008 with his F&F investors and had he shared all the risk factors their investments were subject to by investing with him in his business activities, there would have been a "run on the bank," and Mastro would have faced the call of most of the approximately $100 million he [owed] to these investors.
>
> On September 30, 2008, Mastro attempted to alleviate the concerns of F&F investors by sending them a letter that ended with "our organization is strong and healthy, in no small part because of the relationships we value so greatly with lenders including you, our friends and family.  I hope this report has eased any concerns you may have." . . . [T]his letter did not fairly describe Mastro's financial condition or the risks one faced by continuing to invest with him.

Id. ¶ 10.  In Mr. Rigby's first report to the creditors, which was filed on October 15, 2009, he concluded that "general unsecured creditors," including plaintiffs, would "receive at best, a small dividend from the bankruptcy estate."  Id. ¶ 18 (internal quotation marks omitted); see also Def.'s Opp'n Ex. 23 at 10 (explaining the difficulties in obtaining a return for the general unsecured creditors of the bankruptcy estate due to the rapid decline in the real estate market).  Approximately one year later, on October 28, 2010, in his first annual report to creditors, Mr. Rigby noted that "[t]he Bankruptcy Schedules filed by Mastro listed $325 million in unsecured debt," including unsecured claims by secured creditors.  Am. Compl. ¶ 19 (internal quotation marks omitted).

In the meantime, on October 1, 2009, the Securities Division of the State of Washington Department of Financial Institutions filed a statement of charges against Mr. Mastro that accused him of violating Securities Act of Washington ("Securities Act"), proposed to enter a cease-and-desist order, and proposed to levy a fine.  See generally Def.'s Opp'n Ex. 24.  On January 10, 2010, Mr. Mastro signed a consent order in which he agreed to cease and desist from violating the antifraud section of the Securities Act and to pay a $100,000 fine.  Am. Compl. ¶ 11.

Plaintiffs' 2009 federal income tax return was due on April 15, 2010, and was timely filed. Def.'s Opp'n Ex. 31 at 6; see also I.R.C. § 6072(a).

Plaintiffs' 2010 federal income tax return was due on April 15, 2011, but plaintiffs obtained an extension to file their return by October 15, 2011. Def.'s Opp'n Ex. 39 at 2. Plaintiffs filed their return on April 26, 2011, and received a $77,576 refund.[3] Id. Plaintiffs paid no additional taxes with respect to the 2010 tax year after filing their original return. Id. at 2-3.

On October 25, 2012, a federal grand jury in Seattle returned an indictment with forty-three counts against Mr. Mastro, charging him with bankruptcy fraud and money laundering—both before and after he filed for bankruptcy in 2009. Am. Compl. ¶ 12; see generally id. Ex. C. The indictment also charged Mr. Mastro with filing falsified documents with the Bankruptcy Court. Id. A superseding indictment was filed on November 7, 2012. See generally Pls.' Mot. Judicial Notice Ex. H.

In 2012, plaintiffs filed two Forms 1040X, Amended U.S. Individual Income Tax Return—one for the 2008 tax year and one for the 2009 tax year—claiming a capital loss deduction; specifically, plaintiffs claimed that the six loans to Mr. Mastro, which totaled $511,731, became worthless on October 31, 2008, the date Mr. Mastro revoked the loan redemption rights. See Def.'s Opp'n Ex. 29 at 19 (2008 capital loss due to worthless securities); Def.'s Opp'n Ex. 30 at 14 (2009 capital loss carryover from 2008); see also Def.'s Opp'n Ex. 28 (March 26, 2012 letter to Mr. Shields discussing the tax implications of a capital loss from a worthless investment). The IRS received plaintiffs' 2008 amended return on April 15, 2012, and issued a refund in the amount of $18,264 plus $3,050.57 in interest on September 30, 2013. Def.'s Opp'n Ex. 31 at 2-3. The IRS received plaintiffs' 2009 amended return on July 23, 2012, and issued a refund in the amount of $29,563 plus $2,445.77 in interest on September 10, 2012. Id. at 6-7.

On April 14, 2014, plaintiffs filed an amended federal income tax return for 2010 that contained plaintiffs' names and a refund claim for $1, but included no explanation for the claimed refund. Def.'s Opp'n Ex. 35. On July 16, 2014, plaintiffs submitted another amended return for 2010. Am. Compl. Ex. A at 1-2. This time, plaintiffs asserted a theft loss of $511,731, and alternatively sought safe-harbor relief under Revenue Procedure 2009-20 for a theft loss from a Ponzi-type investment scheme. Id. at 3. Plaintiffs claimed a refund of $37,685, and purported to show a net operating loss ("NOL") of $315,785 as a result of the $511,731 theft loss. Id. at 1, 8-9. That same day, plaintiffs filed a 2007 amended return that absorbed the entire NOL carried back from 2010, and claimed a refund of $102,687. Def.'s Opp'n Ex. 38 at 1-2. Plaintiffs did not indicate the amount of refund claimed under their alternative position. See id. at 6.

---

[3] A portion of plaintiffs' 2010 tax refund—$10,000—was credited towards their 2011 tax liability, and the remaining amount—$67,576—was refunded directly to plaintiffs. Def.'s Opp'n Ex. 39 at 2.

Plaintiffs also filed the following on July 16, 2014:

- A 2008 amended return to "remove the capital losses that were claimed in a previous amended 2008 tax return because of the discovery in 2010 that the same losses qualified as 'Ponzi-type' theft losses that should have been claimed as such in the 2010 tax return." Def.'s Opp'n Ex. 29 at 1-3. The 2008 amended return reported a balance due of $18,264. Id. at 1.

- A 2009 amended return to "eliminate the 2008 short term and long term loss carryforwards from the 2008 amended tax return . . . and eliminate any capital loss carryover to 2010." Def.'s Opp'n Ex. 30 at 1-3. The 2009 amended return reported a balance due of $29,563. Id. at 1.

- A Form 1045, Application for Tentative Refund, that aggregated the aforementioned changes to plaintiffs' 2007, 2008, and 2009 tax returns as a result of plaintiffs' recharacterization of the 2008 capital loss as a 2010 theft loss. See generally Am. Compl. Ex. B.

The IRS took no action on the claims for refund for 2007 and 2010 that were filed on July 16, 2014. Id. ¶¶ 27, 35, 40; see also Def.'s Opp'n Ex. 39 at 2-3. The IRS similarly took no action on the 2008 and 2009 amended returns that were filed on July 16, 2014, and no payment was received by the IRS for those returns. See Def.'s Opp'n Ex. 31 at 3-4, 7-8.

On September 25, 2015, plaintiffs filed a complaint in this court. On October 14, 2015, plaintiffs amended their complaint. Plaintiffs assert three counts in their amended complaint. In count one, plaintiffs allege that, pursuant to I.R.C. § 165, they are entitled to claim a theft loss deduction of $511,731 and are therefore due a refund of $37,685 plus interest for 2010, the year in which the purported theft was ostensibly discovered. Am. Compl. ¶¶ 23, 25. In count two, plaintiffs alternatively allege that, pursuant to Revenue Rule 2009-9 and Revenue Procedure 2009-20, they are entitled to claim a theft loss deduction of $486,144 (95% of $511,731) for the 2010 tax year. Id. ¶¶ 29, 34. Finally, in count three, plaintiffs allege that they are entitled to a refund of $102,687 for 2007 as a result of the NOL carryback from 2010. Id. ¶ 37. Following discovery, the parties filed cross-motions for summary judgment.[4] The motions are now fully briefed, and the court considers oral argument unnecessary.

---

[4] Plaintiffs also filed a motion for judicial notice in support of their motion for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial.  Id. at 324.  Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the court must not weigh the evidence or make findings of fact.  See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

In ruling on cross-motions for summary judgment, the court "must evaluate each motion on its own merits."  First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003).  If neither party meets its burden, then the court must deny both motions.  Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998).


## III. DISCUSSION

**A. The Jurisdiction of the United States Court of Federal Claims Over Tax Refund Suits**

Congress has granted the United States Court of Federal Claims ("Court of Federal Claims") the authority to entertain tax refund suits. 28 U.S.C. § 1346(a)(1) (2012); United States v. Clintwood Elkhorn Mining Co., 553 U.S. 1, 4 (2008). To bring a tax refund suit, a plaintiff must:

- make full payment of its tax liabilities, Flora v. United States, 357 U.S. 63, 75 (1958);

- file a timely claim for refund with the IRS, I.R.C. § 7422(a); and

- file a timely complaint after the refund claim is denied or deemed denied, id. § 6532(a).

By requiring that a plaintiff file a timely refund claim with the IRS, I.R.C. § 7422(a) creates a jurisdictional prerequisite to filing a refund suit in this court. Chi. Milwaukee Corp. v. United States, 40 F.3d 373, 374 (Fed. Cir. 1994); see also Clintwood Elkhorn, 553 U.S. at 7 (noting that Congress must have intended I.R.C. § 7422(a) to have an expansive reach given its inclusion of five "any's" in one sentence). In addition, the timely refund claim filing requirement "is designed both to prevent surprise and to give adequate notice to the [IRS] of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination." Computervision Corp. v. United States, 445 F.3d 1355, 1363 (Fed. Cir. 2006) (internal quotation marks omitted). To that end, Treasury Regulation § 301.6402-2 provides:

> The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the [IRS] of the exact basis thereof. The statement of the grounds and facts must be verified by a written declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

Treas. Reg. § 301.6402-2(b)(1) (2014). For individuals, a refund claim must be filed on Form 1040X. Id. § 301.6402-3(a)(2).

The allowable time period for filing a tax refund claim is described in I.R.C. § 6511(a). See United States v. Dalm, 494 U.S. 596, 602 (1990) ("[U]nless a claim for refund of a tax has been filed within the time limits imposed by [I.R.C.] § 6511(a), a suit for refund . . . may not be maintained in any court."); Stelco Holding Co. v. United States, 42 Fed. Cl. 101, 104 (1998) ("Recently, the Supreme Court unanimously reaffirmed the long-standing principle that the

limitations period under [I.R.C.] § 6511(a) is jurisdictional, and must be strictly construed against a taxpayer whose administrative claim for refund is untimely filed." (citing United States v. Brockamp, 519 U.S. 347, 350-52 (1997))). Further, "[n]o credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in [I.R.C. § 6511(a)] for the filing of a claim for credit or refund, unless a claim for credit or refund is filed by the taxpayer within such period."  I.R.C. § 6511(b)(1).

      The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has recognized four exceptions to the requirement that a taxpayer must file a formal, detailed claim for this court to have subject matter jurisdiction over the taxpayer's tax refund suit. Computervision Corp., 445 F.3d at 1363-64.  Collectively, "this aggregation of rules has come to be known as the substantial variance doctrine."  Id.  The first such exception is the informal claim doctrine.  Id. at 1364.  Under this exception, "a timely claim with purely formal defects is permissible if it fairly apprises the IRS of the basis for the claim within the limitations period." Id.; see also United States v. Kales, 314 U.S. 186, 194 (1941) ("This Court . . . has often held that a notice fairly advising the [IRS] of the nature of the taxpayer's claim, which the [IRS] could reject [as] too general or because it does not comply with formal requirements of the statute and regulations, will nevertheless be treated as a claim, where formal defects and lack of specificity have been remedied by amendment filed after the lapse of the statutory period."); Furst v. United States, 230 Ct. Cl. 375, 380-81 (1982) ("[T]here should be a written component to the informal claim for refund . . . .  Only when the facts and circumstances demonstrate the [IRS] was on notice that a right was being asserted with respect to an overpayment of tax will we hold a timely informal claim was filed."); Pennoni v. United States, 86 Fed. Cl. 351, 362 (2009) ("An informal claim is valid if (1) it is submitted within the limitations period, (2) it has a written component, and (3) it adequately apprises the IRS that a refund is sought and for certain years.").

      The second exception is the waiver doctrine.  Computervision Corp., 445 F.3d at 1365-68.  Under the waiver doctrine, "[i]f the taxpayer files a timely formal claim but fails to include the specific claim for relief, the claim may nonetheless be considered timely if the IRS considers that specific claim within the limitations period."  Id. at 1365.  In other words, "[t]he IRS's consideration of the specific claim is held to be a waiver of the requirement of the regulation that the refund claim 'set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.'"  Id. (quoting Treas. Reg. § 301.6402-2(b)(1)); see also United States v. Memphis Cotton Oil Co., 288 U.S. 62, 65-73 (1945) (holding that a timely claim for a tax refund that fails to state the basis for the claim may not be rejected by the IRS after the IRS has considered the claim on its merits and notified the taxpayer that it was owed a refund prior to the expiration of the limitations period, even though the taxpayer amended its claim after the limitations period had run); Cencast Servs., L.P. v. United States, 729 F.3d 1352, 1368-69 (Fed. Cir. 2013) (refusing to apply the waiver doctrine where, prior to the expiration of the limitations period, the taxpayer failed to raise a particular theory in its claim—the independent contractor theory—and the IRS did not consider or reach any conclusions with respect to that theory in its investigation).

The third exception is the general claim doctrine, which applies when "(1) the taxpayer has filed a formal general claim within the limitations period; and (2) an amendment is filed outside the limitations period that makes the general claim more specific." Computervision Corp., 445 F.3d at 1368. As described by the United States Supreme Court in United States v. Andrews, 302 U.S. 517, 524 (1938):

> Where a claim which the [IRS] could have rejected as too general, and as omitting to specify the matters needing investigation, has not misled [the IRS] but has been the basis of an investigation which disclosed facts necessary to [IRS] action in making a refund, an amendment which merely makes more definite the matters already within [the IRS's] knowledge, or which, in the course of [the IRS's] investigation, [the IRS] would naturally have ascertained, is permissible.

In other words, an amendment that makes a timely general claim more specific is permissible even if not timely filed. Id.; see also Cochran v. United States, 105 Ct. Cl. 628, 636 (1945) (permitting the untimely amendment of a defective claim that failed to state "the nature of the losses sustained . . . [or] the facts relied on to support the claim" because "a broad statutory ground was stated" therein).

The final exception is the germaneness doctrine. Related to the general claim doctrine, the germaneness doctrine

> applies where the taxpayer (1) files a formal claim within the limitations period making a specific claim; and (2) after the limitations period but, while the IRS still has jurisdiction over the claim, files a formal amendment raising a new legal theory—not specifically raised in the original claim—that is "germane" to the original claim, that is, it depends upon facts that the IRS examined or should have examined within the statutory period while determining the merits of the original claim. Unlike the waiver doctrine, the inquiry here is not whether the particular legal <u>theory</u> for recovery has been considered by the IRS during the limitations period but whether the underlying <u>facts</u> supporting that legal theory were discovered or should have been discovered by the IRS in considering the original claim during the limitations period.

Computervision Corp., 445 F.3d at 1369-70; see also Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 31 (1933) (allowing the taxpayer to amend its original claim because the amendment did "not differ in matter of substance from the claim as first presented"); Addressograph-Multigraph Corp. v. United States, 112 Ct. Cl. 201, 222-23 (1948) (allowing the taxpayer to amend its original refund claim because the amendment "merely made more definite the matters already within the knowledge of the [IRS], which in the course of [the IRS's] investigation [the IRS] actually did ascertain.").

## B. The Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Request for a Tax Refund for the 2010 Tax Year

### 1. Plaintiffs' April 14, 2014 Tax Refund Claim Is Invalid

In its cross-motion for summary judgment, defendant argues that the court lacks subject matter jurisdiction over plaintiffs' request for a tax refund for the 2010 tax year "because plaintiffs failed to file a timely administrative claim for refund for 2010 that apprised the IRS of the tax relief they sought—a theft loss—as required by [I.R.C.] § 7422(a)." Def.'s Opp'n 12-13. The court agrees.

Section 7422 of the Internal Revenue Code provides:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the [IRS], according to the provisions of law in that regard, and the regulations . . . established in pursuance thereof.

I.R.C. § 7422(a). For a refund claim to be "duly filed with the [IRS]," it must meet the requirements of I.R.C. § 6511, which provides:

> Claim for credit or refund of an overpayment of any tax . . . shall be filed by the taxpayer within [three] years from the time the return was filed or [two] years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within [two] years from the time the tax was paid.

I.R.C. § 6511(a). Where a refund claim is not filed within three years of the filing date of the original return, any refund is limited to the "tax paid during the [two] years immediately preceding the filing of the claim."[5,6] Id. § 6511(b)(2)(B). In addition, a refund claim must also

---

[5] A tax return filed prior to the due date (without extensions) is considered filed on such due date. I.R.C. § 6513(a). Similarly, tax paid prior to the due date (without extensions) of the tax return is considered paid on such due date. Id. A tax return is deemed filed on its postmark date if certain requirements are met. Treas. Reg. § 301.7502-1(a).

[6] An original tax return may also constitute a claim for refund, and is similarly subject to the three-year lookback period. See, e.g., Wertz v. United States, 51 Fed. Cl. 443, 446-47 (2002).

"set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the [IRS] of the exact basis thereof." Treas. Reg. § 301.6402-2(b)(1).

In the instant case, plaintiffs filed two administrative claims for a tax refund for tax year 2010 on Form 1040X—the first on April 14, 2014, and the second on July 16, 2014. Because plaintiffs filed their original 2010 federal income tax return on April 26, 2011, plaintiffs had until April 26, 2014, to file their refund claim. Thus, plaintiffs' April 14, 2014 claim was timely. Plaintiffs' April 14, 2014 claim did not, however, meet the specificity requirements of Treasury Regulation § 301.6402-2(b)(1). While plaintiffs' April 14, 2014 claim identified the taxpayers by name and contained a request for a $1 refund, it failed to describe any basis for the claimed refund. See Waltner v. United States, 679 F.3d 1329, 1334 (Fed. Cir. 2012) ( "[A] form that contains zeros in place of any reportable income does not constitute a valid tax return; it is not 'properly executed' for purposes of [Treasury Regulation] § 301.6402-3(a)(5) and does not meet the specificity requirements imposed by [Treasury Regulation] § 301.6402-2(b)(1).").

Furthermore, none of the exceptions to the requirement that a taxpayer file a formal, detailed claim has been met. First, to qualify for an exception to the rule under the informal claim doctrine, plaintiffs would have had to provide the IRS with a description of both the legal and factual basis for their claim. Plaintiffs' April 14, 2014 claim did neither. See, e.g., Fremuth v. United States, 129 Fed. Cl. 684, 689 (2016) (finding that a letter that failed to "contain enough information to apprise the IRS of the nature of [the plaintiff's] refund claim" was not a valid claim, whereas letters that contained "sufficient detail to apprise the IRS of the nature of [the plaintiff's] refund claim" were valid claims).

Second, for plaintiffs to qualify for an exception to the rule under the waiver doctrine, the IRS must have treated plaintiffs' April 14, 2014 claim as though it was properly filed. In this case, plaintiffs do not allege that the IRS treated their claim as having been properly filed, and there is no evidence that it did.

Third, to qualify for an exception to the rule under the general claim doctrine, plaintiffs would have had to file two claims—a timely formal general claim and then an untimely, more specific second claim. Here, plaintiffs' April 14, 2014 claim does not qualify as a general claim because it contained absolutely no substantive information. Therefore, plaintiffs do not qualify for this exception.

Finally, under the germaneness doctrine, a taxpayer must file two claims—a timely formal specific claim and then an untimely second claim (filed after the limitations period but while the IRS is still processing the first claim) that raises a new, yet germane, theory based on the same facts asserted in the first claim. As noted above, plaintiffs' April 14, 2014 claim contained no factual information, and thus cannot be supported by an untimely second claim.

In sum, plaintiff's April 14, 2014 claim failed to "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the [IRS] of the exact basis thereof," and therefore "will not be considered for any purposes as a claim for refund or credit." Treas. Reg. § 301.6402-2(b)(1). Accordingly, it does not constitute a valid claim for refund, and therefore cannot serve as a basis upon which the Court of Federal Claims can exercise subject matter jurisdiction.

### 2. Plaintiffs' July 16, 2014 Tax Refund Claim Is Untimely

Plaintiffs' second administrative claim for a tax refund for the 2010 tax year was filed on July 16, 2014. Since plaintiffs filed their original 2010 tax return on April 26, 2011, the statute of limitations for filing a timely refund claim expired on April 26, 2014.[7] Because plaintiffs' July 16, 2014 administrative claim was filed nearly three months late, it is untimely. See, e.g., Fremuth, 129 Fed. Cl. at 689 (deeming a refund claim filed on January 30, 2013, as untimely when the statute of limitations had expired in April 2011). Further, plaintiffs' July 16, 2014 claim does not effectively relate back to plaintiffs' April 14, 2014 claim for the reasons explained above. Finally, since plaintiffs did not pay any additional tax after filing their original 2010 return, there was no tax paid in the two years immediately prior to July 16, 2014, for which a refund could have been sought on that date.

Accordingly, plaintiffs' July 16, 2014 claim is untimely, and therefore cannot serve as a basis upon which the Court of Federal Claims can exercise subject matter jurisdiction.

### C. Plaintiffs' Request for a Tax Refund for the 2007 Tax Year Lacks Merit

In the third count of their complaint, plaintiffs assert that, after applying the NOL carryback from their 2010 amended tax return, they are entitled to a tax refund of $102,687 for 2007.[8] The court disagrees. Plaintiffs may not recover twice for the same financial loss.

---

[7] Pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice that April 26, 2014, was a Saturday. Therefore, plaintiffs' refund claim would have been timely had it been filed on April 28, 2014, the next business day. See I.R.C. § 7503.

[8] Plaintiffs' administrative claim for a tax refund for 2007, which carried back a remaining NOL due to the alleged 2010 theft loss, was filed on July 16, 2014. Because plaintiffs had obtained an extension to file their 2010 federal income tax return by October 15, 2011, they had until October 15, 2014, to file their administrative claim due to an NOL carryback from 2010. See I.R.C. § 6511(d)(2) ("If the claim for credit or refund relates to an overpayment attributable to a net operating loss carryback or a capital loss carryback, in lieu of the [three]-year period of limitation prescribed in subsection (a), the period shall be that period which ends [three] years after the time prescribed by law for filing the return (including extensions thereof) for the taxable year of the net operating loss or net capital loss which results in such carryback . . . . In the case of such a claim, the amount of the credit or refund [is allowed] to the extent of the amount of the overpayment attributable to such carryback."). Thus, plaintiffs' claim for a 2007 refund was timely.

Plaintiffs initially characterized, on 2008 and 2009 amended federal income tax returns filed in 2012, the losses they suffered from Mr. Mastro's defaulting on his loans as capital losses. As a result, plaintiffs received tax refunds arising from those returns—a total of $53,323.34 including interest—and continued to carry forward the unused capital loss from the default into 2010.[9]  In their current suit, however, plaintiffs now characterize the 2008 capital loss as a theft loss arising in 2010.  The doctrine of quasi-estoppel precludes plaintiffs from doing so.[10]

The United States Court of Claims ("Court of Claims"), the predecessor court to the Federal Circuit, stated that the purpose of the doctrine of quasi-estoppel, also known as the "duty of consistency," see Lewis v. Comm'r, 18 F.3d 20, 26 (1st Cir. 1994), is

> to prevent a taxpayer, after taking a position in one year to his advantage and after correction for that year is barred, from shifting to a contrary position touching on the same facts or transaction.  A key element is the fact that the earlier position was then to the advantage of the taxpayer but that it is now to the taxpayer's advantage to shift his position.

Union Carbide Corp. v. United States, 222 Ct. Cl. 75, 90 (1979) (citation omitted).  Furthermore, the doctrine only applies to a misstatement of fact, "one on which the government reasonably relied, in the sense that it neither knew, nor ought to have known, the true nature of the transaction mischaracterized by the taxpayer."  Lewis, 18 F.3d at 26.

The Court of Claims has also emphasized:

> Three elements are necessary to establish that a duty of consistency exists, such that a party is estopped, or quasi-estopped, from changing its position.  First, the taxpayer must have made a representation or reported an item for tax purposes in one year; second, the [IRS] must have acquiesced or relied on that fact for that year; and third, the taxpayer must desire to change the representation, previously made, in a later year after the statute of limitations on assessment bars adjustment for the initial years.

Hess v. United States, 210 Ct. Cl. 483, 495 (1976); see also R.H. Stearns Co. v. United States, 291 U.S. 54, 61-62 (1934) ("The applicable principle is fundamental and unquestioned.  He who prevents a thing from being done may not avail himself of the nonperformance which he has himself occasioned, for the law says to him, in effect:  This is your own act, and therefore you are not damnified.  Sometimes the resulting disability has been characterized as an estoppel,

---

[9] The record before the court does not reflect whether plaintiffs continued to carry forward the remaining capital loss from the default into 2011 and beyond.

[10] Because plaintiffs are estopped from asserting this theory, the court need not consider whether plaintiffs' loss qualifies as a theft loss under I.R.C. § 165.

sometimes as a waiver. The label counts for little. Enough for present purposes that the disability has its roots in a principle more nearly ultimate than either waiver or estoppel, the principle that no one shall be permitted to found any claim upon his own inequity or take advantage of his own wrong." (citation and internal quotation marks omitted)); Estate of Ashman v. Comm'r, 231 F.3d 541, 544 (9th Cir. 2000) ("When all is said and done, we are of the opinion that the duty of consistency not only reflects basic fairness, but also shows a proper regard for the administration of justice and the dignity of the law. The law should not be such a[n] idiot that it cannot prevent a taxpayer from changing the historical facts from year to year in order to escape a fair share of the burdens of maintaining our government. Our tax system depends upon self assessment and honesty, rather than upon hiding of the pea or forgetful tergiversation."); Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600 (9th Cir. 1996) (noting that the doctrine of judicial estoppel "precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position.").

In Ashman, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") affirmed the United States Tax Court's application of the duty of consistency doctrine after it found that the taxpayer's change of position from a representation that a pension distribution was timely rolled over to one that it was not timely rolled over constituted a change in representation that was relied upon by, and detrimental to, the IRS. 231 F.3d at 545-46. Significantly, the Ninth Circuit held that Ashman made "a clear representation that she had complied with the requirements of [I.R.C.] § 402(c)(3)" when she "declared as a matter of fact that the amount of the rollover of the $725,502 distribution was $725,502, and that it went to Merrill Lynch," even though that is not what happened. Id. The Ninth Circuit observed:

> Finally, Ashman argues, she has not really changed her representations. Rather, she simply made an incorrect legal statement in 1990 and then corrected it in 1993. We reject that argument. As we see it, her representation in 1990 was that, as a matter of fact, she had rolled over the amount within [sixty] days. She now wants to change that representation; she cannot. If she could, she would surely harm the [IRS]; she would have managed to obtain $100,502.21 tax free by misleading [the IRS].

Id. at 546.

The facts in the instant case are analogous to those in Ashman. First, plaintiffs stated that, as a matter of fact, they suffered a capital loss in 2008 that carried forward into 2009 and beyond. Thus, plaintiffs made a representation or reported an item for tax purposes—in this case, for two years. Second, plaintiffs received tax refunds for 2008 and 2009. Thus, the IRS relied on plaintiffs' representation that they had suffered capital losses. Finally, plaintiffs now contend that the capital losses they suffered as a result of Mr. Mastro's inability to repay his F&F loans were actually theft losses. Although plaintiffs filed amended returns for 2008 and 2009 to reflect a 2010 theft loss instead of a 2008 capital loss due to Mr. Mastro's default, plaintiffs did not do so until July 16, 2014—well after the statute of limitations on assessment bars any such

adjustment.[11]  Thus, plaintiffs attempted to change their representation after the statute of limitations expired.

Because all three elements of the doctrine have been satisfied, plaintiffs are bound by the duty of consistency.[12]  See, e.g., Squeri v. Comm'r, T.C. Memo. 2016-116 (2016) (holding that, pursuant to the duty of consistency, the petitioners were bound by their previous declaration that certain income was earned in a later tax year when in fact it was earned in an earlier tax year); Koppen v. Comm'r, T.C. Memo. 1995-316 (1995) (holding that, pursuant to the duty of consistency, the petitioner was bound by his previous declaration that gain from the sale of property was realized in a later tax year when it was in fact realized in an earlier tax year).

### IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or immaterial.

Plaintiffs' April 14, 2014 administrative claim for refund was not a valid claim because it failed to contain any grounds upon which the refund was sought, and plaintiffs' July 16, 2014 administrative claim was not timely filed because the statute of limitations expired on April 26, 2014.  Accordingly, the Court of Federal Claims lacks subject matter jurisdiction over plaintiffs' claims with respect to the 2010 tax year.  In addition, the duty of consistency prevents plaintiffs from maintaining their refund claim with respect to the 2007 tax year.

---

[11]  Plaintiffs' 2008 federal income tax return was deemed filed on April 15, 2009, and plaintiffs' 2009 federal income tax return was deemed filed on April 15, 2010.  Therefore, the three-year statute of limitations on assessment, see I.R.C. § 6501(a), expired on April 15, 2012, with respect to plaintiffs' 2008 tax return, and on April 15, 2013, with respect to plaintiffs' 2009 tax return.  Although the limitations period can be extended by agreement, any such agreement must be executed prior to the expiration of the limitations period.  Id. § 6501(b)(4).  There is no evidence in the record before the court that an agreement extending the limitations period was executed for either 2008 or 2009.  Therefore, even if plaintiffs attempted to pay additional tax with respect to 2008 and 2009—whether via payment or an offset to any refunds plaintiffs might otherwise be due—the IRS lacks authority to collect any such tax because it was not assessed within the limitations period.  Further, there is no evidence that any exceptions to the three-year statute of limitations on assessment (such as failing to file a return, filing a false or fraudulent return, a willful attempt to evade tax, or a substantial omission) apply to plaintiffs with respect to 2008 or 2009.

[12]  The court also observes that plaintiffs, despite alleging that they "discovered the theft [in] 2010," Am. Compl. ¶ 25, filed—in 2012—their 2008 and 2009 amended federal income tax returns reflecting a capital loss arising in 2008.

Therefore, the court **DENIES** plaintiffs' motion for summary judgment or partial summary judgment and **GRANTS** defendant's cross-motion for summary judgment. Counts one and two of plaintiffs' complaint are **DISMISSED** for lack of subject matter jurisdiction, and count three of plaintiffs' complaint is **DISMISSED** on its merits. All other pending motions are **DENIED AS MOOT**. No costs. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge